# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## NORTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>vs.<br><br>**APOLONIO RODRIGUEZ, and BERNARDO HERRADA,**<br><br>Defendants. | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM DECISION AND ORDER GRANTING MOTION TO SUPPRESS**<br><br>Case No. 1:12CR73DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Defendants Apolonio Rodriguez's and Bernardo Herrada's Motions to Suppress Evidence [Docket Nos. 23, 24]. The court held an evidentiary hearing on the motions to suppress on January 29, 2013, and closing arguments on March 13, 2013. At the hearings, Defendant Apolonio Rodriguez was present and represented by James C. Bradshaw, Defendant Bernardo Herrada was present and represented by J. Edward Jones, and Plaintiff was represented by Robert C. Lunnen. The court has carefully considered the evidence and testimony presented at the evidentiary hearing, the parties' memoranda, and the law and facts relating to the motions. Now being fully advised, the court renders the following Memorandum Decision and Order.

### A. FINDINGS OF FACT

On September 21, 2012, around 2:00 a.m., Logan City Police Officer Shand Nazer and

Officer-in-Training Shawn Oliverson conducted a traffic stop of a Chevy Astro van, in which Defendants were the occupants. Officer Nazer has been a police officer for 14 years, including 5 years on the Cache-Rich Drug Task Force. Officer Nazer has had extensive drug investigation training and personal experience stopping vehicles in which narcotics were found.

Prior to the stop on September 21, 2012, Agent William Barber with the Cache-Rich Drug Task Force, contacted Nazer and informed him that he had been conducting an investigation and received information that a Chevy Astro van was being used to transport methamphetamine into Utah. Barber told Nazer that a GPS tracking device had been placed on the van and the van had gone from Utah to California, stayed for only a few hours in a particular city in California known for being a source for drugs, and was immediately returning to Utah. Barber also informed Nazer that the van had been stopped in Nevada, where a drug dog indicated the presence of narcotics, but no narcotics were found in the subsequent search. Agent Barber told Nazer that he had information that a large speaker box was used in the van to transport drugs and money. Barber also informed Nazer of the names of the suspects operating the van.

Based on Nazer's personal experience investigating drug trafficking cases, Nazer was suspicious that the occupants of the van were transporting narcotics. Officer Nazer knew the city in California to be a place where individuals were getting drugs and believed that a 12 hour drive to that city, only to stay for a few hours, was suspicious of someone engaged in illegal activity.

Independent of the information Barber provided regarding the drug-trafficking investigation, Barber requested that Nazer try to stop the van for a traffic violation when it reached Nazer's location in Logan, Utah. Barber provided location information to Nazer to

enable him to position his patrol car to await the van. Barber was located in Pertersboro, Utah, and alerted Nazer when the van passed by his location. Nazer and Oliverson then saw the van at the intersection of 1000 West and 200 North in Logan, Utah. As the van proceeded south on 1000 West, the officers began following the vehicle at some distance. Eventually, the officers started to follow the van more closely.

As the van approached the intersection of 1000 South, it abruptly changed lanes without signaling for two seconds, and then turned left. Utah law requires a driver to signal for two seconds before changing lanes. Nazer also observed the van cross over the solid white line when it entered into the turning lane instead of entering the turn lane in the designated area. Crossing the solid white line was also a violation of Utah traffic law. Nazer told Oliverson, who was driving the patrol car, to pull the van over because of the failure to signal for two seconds before changing lanes. Officer Oliverson activated the emergency lights on the patrol car and pulled the van over just east of 1000 West on 1000 South.

Nazer approached the driver's side of the van and made contact with the driver, Bernardo Herrada. Oliverson approached the passenger side. Nazer informed Harrada that he had been stopped for failing to signal for two seconds before moving into the turn lane and asked for his driver license, registration, and insurance card. Herrada acknowledged the violation and apologized. Nazer identified the driver as Bernardo Herrada through his driver license.

Nazer returned to the patrol car and asked Oliverson to summon the K-9 Officer and run a records check on the driver's information through the state computer. Nazer already knew the vehicle was properly licensed and insured, but he told Oliverson to have dispatch run the driver

license and license plate even though they already had a "pretty good idea" what it would show. Results from dispatch came back within one minute and confirmed that Herrada had a valid license and that the van was registered and insured to a female.

Oliverson began to write a warning citation for the violation. About two minutes later, the K-9 Officer arrived and ran his dog, Endy, around the outside of the van. Nazer observed the dog search from his patrol car. When the dog got to the middle of the van on the driver's side, it began to bark and look back and forth from his handler to the van. The K-9 Officer explained to Nazer that the dog had a change in behavior but the dog did not indicate. He told Nazer that, while he was aware that some courts had ruled that a change in behavior was sufficient to indicate probable cause to search, he personally chose not to search unless he received a full indication. After he finished speaking to the K-9 Officer, Nazer noticed that Oliverson was printing out the warning citation.

Nazer called Barber to discuss how to proceed with the investigation because the dog did not sufficiently indicate. Nazer suggested that they give the driver the warning citation, terminate the traffic stop, and try to obtain consent to search the van. The other officers decided there was no other choice.

Nazer and Oliverson approached the driver's window. The K-9 Officer approached the passenger side of the vehicle. All of the officers were wearing uniforms and were armed. The lighting surrounding the van was very limited. Therefore, the officers used flashlights to illuminate the area and appeared to be flashing them around to look into the van. Nazer gave Herrada the warning and returned his license, registration, and insurance card. Nazer explained

to Herrada that he was only being given a warning and not a citation. Nazer crossed out the court information on the warning and explained that it had been mistakenly printed out. Herrada asked if he needed to go to court, and Nazer told him that he did not need to appear in court, that he was free to go, and he stepped slightly back from the van. The other officers did not appear to move.

Herrada asked Nazer if he had returned his license to him, and Nazer affirmed that it was with the documents he had given him. Nazer told Herrada that the dog had changed behavior and that it was strange. However, Nazer again told Herrada that he was free to go. Nazer again stepped slightly away from the van and may have stopped talking for a couple of seconds. However, he then proceeded to say that while they were there, he was wondering whether there was anything illegal in the van, like drugs or weapons. Herrada answered that there was not. Nazer then said that he just wanted to make sure and he asked the men to step out of the van. Both Defendants exited the van. The other officers were still surrounding the van. Nazer asked Herrada for consent to search the van, and Herrada answered "yes." Herrada and Rodriguez moved away from the van and were told to stand in a specific location with an officer next to each of them.

As a result of the search, officers found two bundles inside a large speaker box on the floor of the van. The packages contained substance that field tested positive for methamphetamine.

During the search of the van, Herrada carried on a conversation in English with Oliverson. They discussed where Herrada had come from that night, where he worked, how he

met his wife, etc. He answered several questions appropriately. Oliverson believed that Herrada seemed to understand him and was able to hold a good conversation.

Herrada testified that he speaks to his wife in English and Spanish and they have been together for five years. He took his driver license test in English. Herrada also remembered Nazer asking to search the van and answering yes. He testified, however, that he felt he had no choice in the matter. Although Herrada said that he never told the officers that he did not understand English, he testified that there is a lot that he does not understand. His wife also testified that he does not like to acknowledge that he does not understand certain words in English because it makes him embarrassed. Herrada was given his *Miranda* warning in English. Both Herrada and his wife testified that he does not speak English well enough to understand the legal terms in the warning.

### B. CONCLUSIONS OF LAW

Defendants seek to suppress all evidence seized from the van, challenging the constitutionality of the traffic stop, the length of the detention, and the consent to search the van. Defendant Herrada also seeks to suppress any inculpatory statements he made to officers, asserting that his *Miranda* rights were violated because they were not given in Spanish.

**1. Traffic Stop**

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *United States v. Bolero-Ospina*, 71 F.3d 783, 787 (10th Cir. 1995). The subjective motives of the officer are not relevant. *United States v.*

*Kitchell*, 653 F.3d 1206, 1216 (10th Cir. 2011).

In this case, the officers stopped Defendants based on an observed traffic violation. There is a video from the patrol car dashboard showing that Herrada did not signal for two seconds before proceeding into the turn lane. Utah Code Annotated Section 41-6A-804 requires "[a] signal of intention to turn right or left or to change lanes shall be given continuously for at least the last two seconds preceding the beginning of the movement." Nazer observed, and the video demonstrates, that the van crossed into the turn lane without signaling for two seconds before entering the turn lane. Therefore, the officers observed a clear traffic violation and the traffic stop was justified at its inception.

### 2. Scope of Detention

It is well established that a traffic stop is a limited seizure and is more like an investigative detention than an arrest. *Kitchell*, 653 F.3d at 1216. In addition to being justified at its inception, to be lawful, a traffic stop must also be "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 1217. "The investigative detention usually must last no longer than is necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to it underlying justification." *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir. 1998).

Defendants argue that the stop exceeded the time necessary to issue the warning. An officer conducting a routine traffic stop may detain a driver while requesting a driver license, vehicle registration, and proof of insurance, run necessary computer checks, and issue appropriate citations or warnings. *Kitchell*, 653 F.3d at 1217.

In this case, Defendants contend that the computer checks were unnecessary because the officers had already done the checks on the vehicle and individuals before stopping the van. However, it is not clear from the record when the prior checks had been done. It would be unusual for an officer not to run contemporaneous computer checks. Although it is possible that the checks were not entirely necessary, the court cannot conclude that running the computer checks was unreasonable and, therefore, does not find the time taken to run the computer checks to be unreasonable.

Defendants also argue that the canine sniff of the car unduly prolonged the stop. However, the officers immediately called the K-9 officer and he had completed the canine check before Oliverson completed the warning. Therefore, there is no evidence that the canine sniff prolonged the detention.

Finally, Defendants argue that the stop was unduly delayed by the officers discussing how to proceed after the canine did not provide probable cause to search the vehicle. The officers spoke for approximately two to three minutes about how to approach the investigation given that the canine did not indicate. The video demonstrates that the warning was printed while the conversation occurred. Nazer specifically tells Barber that the warning is printed before the conversation ends and the officers decide their only option is to obtain consent.

The two-to-three minute delay as a result of the conversation was not related to the traffic violation. The fact that this time was in fact a delay is consistent with the officer's testimony that a stop usually takes between ten to twelve minutes, whereas the stop in this case took approximately 14 minutes.

An officer may detain a driver beyond the scope of the initial traffic stop if (1) the officer observes facts and circumstances that provide him objective reasonable suspicion that the driver is engaged in illegal activity, or (2) the detention becomes a consensual encounter. *United States v. Davis*, 636 F.3d 1281, 1290 (10th Cir. 2011). Whether an officer has detained a driver beyond the scope of the traffic stop is determined by examining the "totality of the circumstances" of each case to evaluate "whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Id.* at 1290-91. Also, an officer conducting a stop may rely on communications from another officer who has reasonable suspicion. *United States v. Wilkinson*, 633 F.3d 938, 941 (10th Cir. 2011).

The government asserts that the prolonged detention was justified because the officer had an objective reasonable suspicion of illegal activity separate from the traffic violation. The officer knew the van had a GPS devise on it because it was suspected of transporting drugs. The officer also knew Defendants were returning from a trip to California where they had stayed only a few hours in a city known as a "drug source" city. In addition, during the stop, the dog changed behavior even though it did not indicate. However, when the dog failed to indicate there was little evidence to suspect that drugs were in the van. Even if drugs had been in the van when it left California, there is no evidence suggesting that the drugs were still in the van. The officers knew that when the van was in Nevada it was searched and no drugs were found. It is unclear from the evidence whether the search in Nevada occurred before or after the van stopped in California. In addition, the officers did not testify as to whether they had been tracking all of the van's stops along the twelve-hour route from California to Utah. After the dog failed to indicate,

9

the facts and circumstances do not support reasonable suspicion of illegal activity. The court finds that it was unreasonable for the officers to prolong the detention for several minutes while discussing how they could proceed in order to search the van.

### 3. Consent

Finally, Defendants argue that the prolonged detention did not turn into a consensual encounter after the officers returned Herrada's documents and told him he was free to go. On the scene, the officers recognized that the only basis they had available to them was to end the traffic stop and then engage in a consensual detention and seek consent to search the van.

A detention for a traffic citation can turn into a "consensual encounter" only when "a reasonable person under the circumstances would believe he was free to leave or disregard the officer's request for information." *United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1308 (10th Cir. 2006). While returning a driver's documents is necessary to show a police-citizen encounter is consensual, it alone is not always sufficient. *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005).

In this case, the video establishes that even though Nazer stated that Defendants were free to leave, the officer's actions indicated otherwise. Nazer took only a slight step away from the van and he proceeded to talk to Defendants after only a couple of seconds passed. There was no true break in the encounter. Moreover, the other officers continued to surround the van with their flashlights pointing at the van. A reasonable person in that situation would not have felt free to leave and would not have felt free to ignore the officer's subsequent questions. After Herrada denied that there were any drugs or weapons in the vehicle, Nazer stated that he wanted to make

sure and he asked the Defendants to exit the van. A reasonable person would not have felt free to stay in the van when the officer requested them to get out of the car so he could check the accuracy of Herrada's response. Although the officers were attempting to make the detention after they returned the documents consensual, this detention was not consensual.

After telling Defendants he wanted to make sure there were no drugs or weapons in the van and asking Defendants to exit the van, Nazer asked for consent to search. At that time, Defendants were moved away from the van and each placed with one of the other officers. There were three officers total and a canine at the scene. It was the middle of the night on a dark and secluded street. The officers were all in uniform, armed, and providing the only real light at the scene by holding flashlights. The officer gave no indication that Defendants could refuse consent and, in fact, had prefaced his request by stating that he wanted to make sure Herrada had given a truthful response. Under the circumstances, the court finds that no reasonable person would have felt free to refuse the officer's request to search. Therefore, the court concludes that Herrada's consent to the search was not freely given and the search violated Defendants' Fourth Amendment rights. Accordingly, the court suppresses all evidence seized in the search.

**4. Herrada's Statements**

Based on the above ruling that a Fourth Amendment violation occurred, in order for Herrada's statements to be suppressed, he must show a "factual nexus between the illegality and the challenged evidence," i.e., his statements. *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000). The court finds that the statements sought to be suppressed would not have come to light but for the officers' unconstitutional search. The statements are not too

attenuated from the search as to dissipate any taint. The situation was sufficiently connected to find that the statements were a product of the illegal search. Accordingly, the court finds Herrada's statements to be "fruits of the poisonous tree." For the foregoing reasons, Herrada's inculpatory statements made to officers are suppressed.

### C. CONCLUSION

Based on the foregoing, it is hereby ordered that Defendants' Motions to Suppress Evidence [Docket Nos. 23, 24] are GRANTED. The court suppresses all evidence seized in the search of the van and any inculpatory statements Defendant Herrada made to officers.

DATED this 15th day of April, 2013.

BY THE COURT:

_____
DALE A. KIMBALL
United States District Judge